United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 17, 1997 Decided December 30, 1997 

 No. 96-5267

 Jacqueline P. Taylor, et al., 

 Appellants

 v.

 Federal Deposit Insurance Corporation and 

 Ricki Helfer, Chairman, FDIC, 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 94cv01916)

 Robert C. Seldon argued the cause for appellants. With 
him on the brief was Joanne Royce.

 Marina Utgoff Braswell, Assistant U.S. Attorney, argued 
the cause for appellees. With her on the brief was Mary Lou 
Leary, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. 


Attorney. John D. Bates, Assistant U.S. Attorney, entered 
an appearance.

 Before: Williams, Sentelle and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Concurring opinion filed by Circuit Judge Rogers.

 Williams, Circuit Judge: Three former employees of the 
Resolution Trust Corporation ("RTC") have sued the corpora-
tion, claiming that it retaliated against them for making 
protected disclosures, in violation of the RTC Whistleblower 
Act, 12 U.S.C. s 1441a(q), and the First Amendment. When 
the RTC's statutory life expired, its statutory successor, the 
Federal Deposit Insurance Corporation ("FDIC"), was substi-
tuted as defendant. On the FDIC's motion for dismissal or, 
alternatively, for summary judgment, the district court dis-
missed the statutory counts of the complaint under Rule 
12(b)(6) and entered summary judgment for the defendant on 
the constitutional counts. This appeal followed. Except to 
the extent that we vacate for want of jurisdiction, we affirm.

 

 * * *

 The Financial Institutions Reform, Recovery, and Enforce-
ment Act of 1989 created the RTC to manage and resolve 
savings and loan cases. 12 U.S.C. s 1441a(b). With the 
exception of its CEO, the RTC had no employees of its own; 
it drew them instead from the FDIC. 12 U.S.C. 
s 1441a(b)(8). In 1991, appellants Bruce Pederson and Jac-
queline Taylor were senior attorneys in the RTC's Western 
Regional Office in Denver, attached to the Professional Lia-
bility Section ("PLS"), whose assigned task was to bring suits 
against disloyal fiduciaries of failed savings and loans. The 
third appellant, Juan Luis Burgos-Gandia, occupied a differ-
ent office (Dallas) and served in a different capacity. A 
fourth ex-employee plaintiff, Richard Dunn, is not a party to 
this appeal but will be conspicuous by his absence.

 Pederson and Taylor's conflict with the RTC began in 1992, 
when they took issue with a reorganization of their office 
initiated in anticipation of the RTC's 1995 statutory sunset. 


See 12 U.S.C. s 1441a(m)(1). In March of 1992, Pederson 
circulated a memo to RTC management detailing his concerns 
that the reorganization would hinder the PLS. Joint Appen-
dix ("J.A.") 786. To no avail; the reorganization went on as 
planned and on May 11 of 1992, he and Taylor were selected 
for return to the FDIC as part of the "put-back" program.1 
In anticipation, they were assigned to a "Special Projects 
Unit" which occupied a different Denver office and, according 
to Pederson and Taylor, constituted a professional purgato-
ry--they were denied meaningful work, support staff, com-
puter links and supplies, and they were ostracized by former 
colleagues afraid to be seen with them. J.A. 754-55.

 Having achieved little with his internal memo, Pederson 
changed forum and theme: During the summer and into the 
fall of 1992, he and Taylor communicated with the General 
Accounting Office ("GAO") and testified before the Senate 
Banking Committee, alleging now that the reorganization was 
concocted to protect well-connected malefactors by ham-
stringing their PLS pursuers. The GAO and RTC's Inspec-
tor General investigated; reports issued in the summer of 
1993 found no illicit cronyism, but concluded that the reorga-
nization had been handled poorly.

 The put-back program was canceled in July 1992, but 
Pederson and Taylor remained in their Special Projects exile. 
There, they contend, they were subject to continual retalia-
tion and discrimination until their May 1995 resignations 
(which they characterize as constructive discharges).

 Appellant Burgos was employed as a litigator in RTC's 
Dallas office. His troubles started, he alleges, when he 
notified his superiors of overbilling by outside counsel. In 
response, RTC management allegedly assigned him to unde-
sirable cases, including some in which the RTC had already 
defaulted. Burgos claims that in one of these cases, Crabb v. 
Federal Home Loan Mortgage Corp., his superiors continued 

__________
 1 Appellants' briefs have not directed us to any evidence associat-
ing Taylor with any protest activity of hers, with or without 
Pederson, before the May 1992 "put-backs." In the summary 
judgment analysis we assume in her favor that such evidence exists.


to litigate despite a settlement, against the wishes of the 
client (another branch of the RTC) and in order to conceal 
their earlier default. Burgos urged his supervisors to aban-
don the litigation; when they did not heed him, he directed 
outside counsel to withdraw a pending motion. Burgos's 
superiors ordered him to rescind that instruction; when he 
refused, they countermanded it themselves. Burgos then 
filed an "Informative Motion" with the Crabb court, disclosing 
the role of his superiors in the decision to continue litigation, 
as well as his opposition to that decision.

 The RTC notified Burgos that he would be fired for this 
insubordination; in fact it simply placed him on paid adminis-
trative leave. Eventually informed that he would be demoted 
two pay grades, he resigned on January 8, 1995. Like Taylor 
and Pederson, Burgos characterizes his resignation as a 
constructive discharge.

 

 * * *

 As we have said, the district court dismissed the statutory 
claims of Pederson, Taylor and Burgos and granted the FDIC 
summary judgment on the constitutional ones. But there was 
another ex-employee, Dunn, who had joined the original 
claim. (A fifth plaintiff, the Government Accountability Pro-
ject, was also a party to the district court litigation but has 
withdrawn from the action.) Although the district court 
dismissed the statutory claims of all plaintiffs, it initially 
withheld judgment on Dunn's constitutional claims. To avoid 
delay in their appeal, the three plaintiffs now before us filed a 
Motion to Direct Entry of Final Judgment without waiting for 
the disposition of Dunn's claims, arguing in the words of Rule 
54(b) that there was "no just reason for delay." The court 
then issued an order, observing that grant of the plaintiffs' 
motion would be "just and proper," and ordering that the 
clerk "be directed" to enter final judgment dismissing their 
claims.

 Rule 54(b) mediates between the sometimes antagonistic 
goals of avoiding piecemeal appeals and giving parties timely 
justice. See Curtiss-Wright Corp. v. General Elec. Co., 446 
U.S. 1, 8 (1980). In a case involving multiple claims or 


parties, it allows the district court to "direct the entry of a 
final judgment as to one or more but fewer than all of the 
claims or parties only upon an express determination that 
there is no just reason for delay and upon an express 
direction for the entry of judgment." Federal Rule of Civil 
Procedure 54(b). The district court functions as a "dispatch-
er," determining in its sound discretion when a claim should 
proceed on to appellate resolution, and when it should await 
its fellows.2 Curtiss-Wright, 446 U.S at 8.

 Here, the district court's order clearly gave the "express 
direction" that the rule requires, but did it make the neces-
sary "express determination"? Given plaintiffs' invocation of 
Rule 54(b)'s "no just reason for delay" formula in their motion 
for entry of judgment under that rule, and the court's obvious 
embrace of their position, it is as clear as these things get 
that the court was convinced that the rule's criteria were 
satisfied. Our circuit has never decided precisely what a 
Rule 54(b) "express determination" requires. In Kelly v. 
Lee's Old Fashioned Hamburgers, Inc., 908 F.2d 1218 (5th 
Cir. 1990), a deeply split Fifth Circuit considered the issue en 
banc, the majority finding it sufficient that the order and 
related parts of the record revealed an "unmistakable intent 
to enter a partial final judgment under Rule 54(b)." Id. at 
1220. There was no need, said the majority, for the district 
judge to "mechanically recite the words 'no just reason for 
delay.' " Id. The majority, however, never really answered 
the dissenters' point that "express," the Rule's modifier of 
"determination," does not normally mean "implied." Id. at 
1222; accord Granack v. Continental Casualty Co., 977 F.2d 
1143, 1144-45 (7th Cir. 1992).

__________
 2 The district court may not, of course, use Rule 54(b) to certify a 
judgment that is not final by ordinary standards. See Curtiss-
Wright, 446 U.S. at 7-8; Tolson v. United States, 732 F.2d 998, 999 
(D.C. Cir. 1984). It is clear that the dismissals and summary 
judgments at issue here possess the requisite finality; they dispose 
of all the claims of the appellants here.


 Without some convincing answer to the Fifth Circuit dis-
senters' challenge, we do not know how our circuit could 
reject their analysis. Certainly no such answer emerged at 
oral argument. Were we to apply the dissenters' view, we 
would be compelled to dismiss the appeal. Here that would 
be clearly wasteful in the short run: the case would vanish 
from the docket of a panel that has invested much time on the 
merits. Our dismissal of this appeal, besides following the 
rules as understood by the Fifth Circuit dissenters, would 
have its pay-off in future cases, by inspiring closer district 
court focus on the criteria of Rule 54(b) and by removing 
ambiguities as to what they actually require.

 In this case, happily, we need not bite this distasteful 
bullet. The government raised the Rule 54(b) issue in a 
motion for dismissal or summary affirmance before a motions 
panel of this court. The motion was denied, see March 31, 
1997 Order, Taylor v. FDIC (No. 96-5267), and that decision 
is law of the case, preclusive for all matters decided expressly 
or by necessary implication. See Crocker v. Piedmont Avia-
tion, 49 F.3d 735, 739 (D.C. Cir. 1995). The panel's decision 
is binding, even though the adequacy of the determination is 
a jurisdictional prerequisite. See LaShawn A. v. Barry, 87 
F.3d 1389, 1394 (D.C. Cir. 1996) (en banc).

 Law of the case, yes; law of the circuit, no. The order of 
the motions panel went unpublished and will bind no panel of 
this court in any other case. See D.C. Cir. Rule 28(c). Thus 
the issue that so divided the Fifth Circuit remains unresolved 
here. Cf. U.S. General, Inc. v. City of Joliet, 598 F.2d 1050, 
1051 n.1 (7th Cir. 1979) ("Future Rule 54(b) certifications with 
similar deficiencies may not be expected to survive in this 
court.").

 While on the subject of Rule 54(b), we note that some 
appellate courts not only demand that the "express determi-


nation" be literally express but also expect the district court 
to supply a statement of reasons. The lack of such a state-
ment may leave the appellate court uncertain whether the 
district judge exercised its discretion soundly, or indeed 
whether it exercised its discretion at all. See, e.g., United 
States v. Ettrick Wood Products, Inc., 916 F.2d 1211, 1218 
(7th Cir. 1990); Allis-Chalmers Corp. v. Philadelphia Elec-
tric Co., 521 F.2d 360, 364 (3d Cir. 1975). Its presence aids 
both the circuit reviewer and the district decisionmaker. See 
Arlinghaus v. Ritenour, 543 F.2d 461, 464 (2d Cir. 1976). 
With a clear statement of reasons, "discretion carefully exer-
cised is rarely upset." Ettrick Wood, 916 F.2d at 1218.

 As law of the case removes the Rule 54(b) problem from 
our purview, we proceed to the merits.

 

 * * *

 Pederson and Taylor were employed in the same office and 
allege largely the same pattern of disclosure and retaliation. 
We examine their claims as a unit, then those of Burgos.

 The district court dismissed Pederson and Taylor's statuto-
ry claims under Rule 12(b)(6). We review this disposition de 
novo, Alicke v. MCI Communications Corp., 111 F.3d 909, 
912 (D.C. Cir. 1997), and find that we cannot agree.

 Dismissal under Rule 12(b)(6) is proper when, taking the 
material allegations of the complaint as admitted, Jenkins v. 
McKeithen, 395 U.S. 411, 421 (1969), and construing them in 
plaintiffs' favor, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), 
the court finds that the plaintiffs have failed to allege all the 
material elements of their cause of action. See, e.g., Kowal v. 
MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 
1994).

 Pederson and Taylor's statutory count claims that the RTC 
violated the RTC Whistleblower Act, 12 U.S.C. s 1441a(q), 
which prohibits discharge of or discrimination against em-
ployees because of their disclosure of information to the RTC, 
the Thrift Depositor Oversight Board, the Attorney General, 
or any appropriate Federal banking agency. But not all 


disclosures qualify for protection. The statute was amended 
effective December 17, 1993 to include disclosures of "gross 
mismanagement, a gross waste of funds, an abuse of authori-
ty, or a substantial and specific danger to public health or 
safety." The 1991 enactment, by contrast, protected only 
disclosures relating to "a possible violation of any law or 
regulation." Pub. L. No. 102-242, s 251, 105 Stat. 2236 
(1991); 12 U.S.C. s 1831j.

 The legal import of this is not that disclosures before the 
amendment are governed by the old statute and those after 
by the new. That would be akin to allowing discrimination 
against female employees if it were based on the fact that 
they had been women before the passage of Title VII. The 
relevant acts are the alleged retaliations. Those after the 
amendment are actionable if they came in response to disclo-
sures (whenever made) in the broader class; 3 retaliation 
before the amendment is actionable only if the instigating 
disclosure revealed a possible violation of law or regulation.4

 Thus, to state a claim for the purposes of Rule 12(b)(6), 
Pederson and Taylor must allege 1) a qualifying disclosure 
that 2) contributed to 3) retaliation, where what is required 
for a disclosure to qualify depends on the date of the alleged 
retaliation. This they achieve; p 20 of their Complaint alleg-
es that they "reported their concerns to the RTC Office of 

__________
 3 The greater the interval between pre-December 17, 1993 disclo-
sures and later adverse decisions, of course, the harder it will be for 
the plaintiff to show the causal link. But that is just a practical 
issue of proof.

 4 Pederson and Taylor argue that the amendments should be 
given retroactive effect, so that pre-amendment retaliations (if there 
were any) for then-unprotected disclosures would become actionable 
when the disclosures became protected. This approach would 
"attach[ ] new legal consequences to events completed before [the 
amendments'] enactment," Landgraf v. USI Film Products, 511 
U.S. 244, 270 (1994). Landgraf says that statutes should not be 
read to produce such retroactivity in the absence of clear Congres-
sional intent, see id., which is completely absent here. See Walleri 
v. Federal Home Loan Bank of Seattle, 965 F. Supp. 1459, 1466 (D. 
Or. 1997).


Inspector General regarding ... staffing decisions that po-
tentially violated personnel laws and regulations." Para-
graphs 29-42 (Pederson) and 47-52 (Taylor) allege retaliation, 
and WW 128-32 (Pederson) and 153-56 (Taylor) recapitulate 
and allege the causal links.

 The FDIC argues that the allegations of p 20 are in essence 
legal, not factual, and need not be accepted as true for the 
purposes of a Rule 12(b)(6) motion. The underlying notion is 
sound: Courts accept plaintiffs' allegations of fact, not their 
conclusions of law. See Kowal, 16 F.3d at 1276. If plaintiffs 
include the text of a disclosure in their pleadings, and then 
claim that it revealed a possible violation of law, we are not 
bound to accept that legal conclusion. If, however, they 
merely allege that they "disclosed a possible violation of law," 
that is a statement of material fact that must be accepted as 
true for a Rule 12(b)(6) motion. We may not draw upon facts 
from outside the pleadings. See Henthorn v. Dep't of the 
Navy, 29 F.3d 682, 688 (D.C. Cir. 1994). In consequence, a 
vague and conclusory complaint may survive a 12(b)(6) motion 
where more detail would disclose fatal weaknesses; defen-
dants' remedy "is not to move [for] dismissal but to serve 
contention interrogatories ... or to proceed to summary 
judgment." Orthmann v. Apple River Campground, Inc., 
757 F.2d 909, 915 (7th Cir. 1985).

 Here in fact the FDIC's motion to dismiss requested 
summary judgment in the alternative, and if summary judg-
ment is the correct disposition, we may convert and affirm on 
those grounds. Cf. Helvering v. Gowran, 302 U.S. 238, 245 
(1937). Summary judgment is appropriate if the pleadings 
and record "show that there is no genuine issue as to any 
material fact and the moving party is entitled to a judgment 
as a matter of law." Federal Rule of Civil Procedure 56(c); 
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). 
We examine the facts in the record and reasonable inferences 
in the light most favorable to the nonmoving party, Wardlaw 
v. Pickett, 1 F.3d 1297, 1299 (D.C. Cir. 1993), but do not 
accept bare conclusory allegations as fact. See Harding v. 
Gray, 9 F.3d 150, 154 (D.C. Cir. 1993). What this standard 


comes down to is that Pederson and Taylor must show, with 
respect to each essential issue on which they will bear the 
burden of proof at trial, either that the issue is conceded in 
their favor or that it turns on a genuinely disputed question 
of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 
(1986).

 From Pederson and Taylor's brief we learn that the per-
sonnel laws and regulations alleged to have been violated are 
5 U.S.C. s 3502(a) and 5 CFR s 351.201. Appellants' Br. at 
26. The former instructs the Office of Personnel Manage-
ment to prescribe regulations for retention preferences in a 
reduction in force; the latter obliges agencies to follow 5 
CFR Part 351 during a reduction in force. How the reorga-
nization possibly violated these requirements is not apparent, 
especially given the FDIC's uncontroverted assertion that the 
reorganization did not constitute a reduction in force and 
hence was not governed by these sections.5

 At oral argument, Pederson and Taylor's counsel explained 
that they did not respond to the FDIC's assertion because it 
was so ludicrous. Dignified silence is a dangerous tactic at 
best; here it proves fatal. Pederson and Taylor fail to offer 
any evidence that the cited laws even apply, much less were 
possibly violated. Their statement of genuine issues of mate-
rial fact, filed pursuant to Local Rule 108(h), makes only the 
cryptic claim that the reorganization violated the law by 
failing to promote "the efficiency of the service," J.A. 294, a 
phrase that appears nowhere in 5 CFR Part 351. We con-
clude that there is no genuine issue of fact here: The 
memorandum to RTC management concerning the reorgani-

__________
 5 5 CFR s 351.201 limits its coverage to occasions on which an 
agency "releases a competing employee from his or her competitive 
level by furlough for more than 30 days, separation, demotion, or 
reassignment requiring displacement...." It is not at all clear 
that the reorganization entailed any releases from "competitive 
level," since FDIC employees on loan to the RTC were by statute 
entitled to "be returned to a similar position." 12 U.S.C. 
s 1441a(q)(8)(B)(i).


zation did not relate to any potential violation of law or 
regulation.

 Pederson and Taylor had also asserted that the reorganiza-
tion was undertaken to protect disloyal savings and loan 
fiduciaries; these assertions may well relate to possible viola-
tions of some law. They were made in the first instance, 
however, not to RTC superiors or the Attorney General but 
to GAO and the Senate Banking Committee, J.A. 380, reach-
ing any statutorily covered recipients only indirectly. Plain-
tiffs argue that it should make no difference. But the RTC 
Whistleblower Act affords its special protection (beyond that 
provided by the First Amendment) only for the act of "pro-
vid[ing] information to" designated entities. 12 U.S.C. 
s 1441a(q)(1). It seems reasonable that Congress would 
afford special protection for communications directed to the 
specified entities, all ones with a capacity to remedy wrongs 
brought to their attention, and would withhold the protection 
from communications that only drift into such hands by 
happenstance. Appellants' reading would completely thwart 
this channeling function.

 Still, Pederson and Taylor's March 1992 memo arguably 
discloses gross mismanagement and hence might qualify un-
der the amended statute. Thus, they would be protected, 
after December 17, 1993, from retaliation for that memo. 
Their problem is that they fail to identify such retaliation--or, 
indeed, any post-1993 retaliation at all. They focus primarily 
on their selection for the put-back program and exile in the 
Special Projects Unit. The reassignment occurred May 11, 
1992--too early to be proscribed retaliation given that the 
March 1992 memo was not protected at that time, and also, 
even if proscribed, too early to be actionable when this suit 
was filed in September 1994, given the two-year limitations 
period of the RTC Whistleblower Act.

 Beyond this, Pederson points to a search of his computer 
and Taylor to an alleged "gag order" imposed in violation of 
her First Amendment rights in March 1994. Pederson's 
claim fails because the computer search took place, according 
to his affidavit, "[o]n or about March 12, 1993," J.A. 760, again 
too early to be proscribed, given that he had at that time 


made no disclosures protected by the pre-December 1993 
law.6 Taylor's claim fails because the "gag order," attached 
to her affidavit, does little more than set out the principle 
"that attorneys do not discuss client matters with the media 
absent express client permission." J.A. 685. Although the 
memo clearly asserted the author's view that Taylor's "media 
contacts" violated the principle of client loyalty and confiden-
tiality, and would justify at least a "formal reprimand," the 
author explicitly refrained even from that. To the limited 
extent that the memo goes beyond directing Taylor's atten-
tion to the policy, evidently of general application within the 
RTC and not unique to her, it does not qualify either as 
retaliation or discrimination, and is on its face no more than a 
response--perhaps a testy one--to Taylor's (unprotected) 
media communications, not to the March 1992 internal memo.

 Both Pederson and Taylor suggest that their career ad-
vancement has been hindered "since May 1992 until the 

__________
 6 Pederson attempts to make the computer incident do double 
duty, offering the search itself as an example of retaliation, and 
arguing also that his disclosure of the search was disclosure of a 
Fourth Amendment violation "directly to senior management." Ap-
pellants' Reply Br. at 13. Because this disclosure may have taken 
place as early as March 12, 1993, it pre-dates the amendments and 
would, if qualifying for Whistleblower Act protection, extend Peder-
son's protection back to that date. We assume that the search did 
qualify as a possible illegality. Nothing in Pederson's affidavits, 
however, supports the claim that he disclosed it to senior manage-
ment, or to any listed entity. There is evidence that Pederson 
discussed the matter with Barbara Shangraw, who herself had 
ordered the search, but the conversation was at her request for the 
purpose of driving home to Pederson the policy against using 
corporate facilities for personal purposes. J.A. 1218, 1444. We 
assume arguendo that a disclosure of an illegality to the perpetrator 
herself could in some instances qualify (as where the whistleblower 
tells a covered person of an illegality that, unbeknownst to the 
whistleblower, had been ordered by the covered person). But we 
do not think that protesting about the legality of a search to a 
superior who ordered it, in the context of a meeting called by the 
superior to discuss its fruits, can fairly be characterized as a 
disclosure--except of the employee's view of the event.


present." J.A. 336-37, 758-59. Ascertaining the relevant 
dates for their various allegations is not easy, but we can find 
only a few incidents occurring after December 17, 1993. 
None of the actual failures to promote fell after that date. 
Pederson applied for various section chief positions, all before 
the fall of 1993, J.A. 758-59, and Taylor, so far as her affidavit 
reveals, applied for nothing after August 1993. J.A. 679-82.

 Two allegations do stretch across the December 1993 
threshold. First is the repeated failure to designate either 
Pederson or Taylor the acting section chief when their superi-
ors temporarily left the office. J.A. 337, 759. To make out a 
prima facie case of retaliation under the RTC Whistleblower 
Act, a plaintiff must show that a protected disclosure was a 
contributing factor in the adverse action complained of. See 
12 U.S.C. s 1441a(q)(5) (prescribing use of 5 U.S.C. s 1221's 
burden of proof system); 5 U.S.C. s 1221(e)(1). This does 
not absolve the plaintiff of the need to offer evidence that 
would amount at least to a prima facie showing of discrimina-
tion under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 
802 (1973).

 Pederson and Taylor have both failed to cross that modest 
threshold. McDonnell Douglas requires the plaintiff to show 
(among other items) that he "applied and was qualified" for 
the vacancy, as well as that the employer, though rejecting 
plaintiff, continued to seek applicants of plaintiff's qualifica-
tions. Id. Pederson and Taylor offer no such evidence with 
respect to the acting section chief position.

 Equally damaging for Pederson and Taylor, we do not 
believe that temporary designation as acting section chief is 
one of the "terms, conditions, or privileges of employment" 
compassed by the Act. 12 U.S.C. s 1441a(q)(1). The phrase 
"terms, conditions, or privileges of employment" is identical 
to the language of Title VII, 42 U.S.C. s 2000e-2(a). Courts 
applying Title VII have consistently focused on "ultimate 
employment decisions such as hiring, granting leave, dis-
charging, promoting, and compensating ... [and not] inter-
locutory or mediate decisions having no immediate effect 
upon employment conditions...." Page v. Bolger, 645 F.2d 


227, 233 (4th Cir. 1981) (en banc); accord Dollis v. Rubin, 77 
F.3d 777, 781-82 (5th Cir. 1995). This circuit has never 
decided the issue. See Mungin v. Katten Muchin & Zavis, 
116 F.3d 1549, 1555 (D.C. Cir. 1997) (noting issue without 
deciding). But see Hayes v. Shalala, 902 F. Supp. 259, 266-
67 (D.D.C. 1995) (rejecting Page).

 We need not decide that precise issue either; what defeats 
these claims (besides want of a prima facie case) is not that 
the denials complained of were mediate but that they were 
minor. The federal courts cannot be wheeled into action for 
every workplace slight, even one that was possibly based on 
protected conduct. Cf. Yates v. Avco Corp., 819 F.2d 630, 638 
(6th Cir. 1987) (finding no adverse action where employer 
required employee to sign form acknowledging circumstances 
of transfer and failed properly to document sick leave).

 Pederson's allegation that he was refused permission to 
attend an internal RTC course on alternative dispute resolu-
tion, J.A. 1771-72, the second qualifying claim, also fails for 
want of a prima facie case. Assuming that exclusion from 
this one seminar amounted to such a denial of training 
opportunities as to represent an adverse action, see Page, 645 
F.2d at 233, Pederson has failed to show how his treatment 
differed from that of similarly-situated employees.

 Finally, both Taylor and Pederson allege a continuing--
indeed, "unrelenting"--pattern of retaliation extending up 
until their resignations. In part this fails for lack of specifici-
ty, but the more serious flaw is that the specific elements of 
the litany--isolation, misdirected mail, poor telephone service, 
unsuitable work--simply constitute the consequences of the 
initial reassignment. Even if that reassignment was retalia-
tory, it was not wrongful, since at that point Pederson and 
Taylor had made no disclosures qualifying them for RTC 
Whistleblower Act protection; and even if it were wrongful, 
any resulting claim would have been time-barred at the point 
when Pederson and Taylor filed suit. Absent some evidence 
that officials aggravated conditions in appellants' occupational 
Siberia, the new statute could not render the continuing 
consequences of an innocent action wrongful--unless the 


amendment affirmatively called for remediation of the past 
innocent act. In any case, an untimely suit "cannot be 
revived by pointing to effects within the limitations period of 
unlawful acts that occurred earlier." Dasgupta v. University 
of Wisconsin Board of Regents, 121 F.3d 1138, 1140 (7th Cir. 
1997); see Palmer v. Barry, 894 F.2d 449, 453 (D.C. Cir. 
1990). Just as the failure of appellants' superiors to relieve 
them from life in Special Projects, though occurring within 
the limitations period, cannot revive their claim or toll the 
statute of limitations, neither can that inaction constitute 
post-December 17, 1993 retaliation.

 Nor does the concept of "continuing violation" assist Peder-
son and Taylor in showing that the continuation of their grim 
working conditions amounted to a post-1993 retaliation. For 
statute of limitations purposes, a continuing violation is "one 
that could not reasonably have been expected to be made the 
subject of a lawsuit when it first occurred because its charac-
ter as a violation did not become clear until it was repeated 
during the limitations period," Dasgupta, 121 F.3d at 1139, 
typically because it is only its cumulative impact (as in the 
case of a hostile work environment) that reveals its illegality, 
id. But the banishment of Pederson and Taylor to Special 
Projects, as they allege it, amply manifested itself as a 
possible retaliation from the start. Just as the continuing low 
pay entailed by a demotion cannot toll the statute of limita-
tions covering the demotion, so continuing hardship in Special 
Projects cannot qualify as a post-1993 retaliation.

 One final issue remains. The district court denied plain-
tiffs' motion for a continuance to take discovery, a decision 
that they assign as error and that we have no difficulty in 
affirming under the abuse of discretion standard appropriate 
to Rule 56(f). That takes care of discovery with respect to 
the grants of summary judgment by the district court, but 
what of a converted 12(b)(6) dismissal? When a district court 
converts a Rule 12(b)(6) motion to one for summary judg-
ment, it must allow all parties both a "reasonable opportunity 
to present all material made pertinent to such a motion by 
Rule 56" and a chance "to pursue reasonable discovery." 
First Chicago Int'l v. United Exchange Co., Ltd., 836 F.2d 


1375, 1380 (D.C. Cir. 1988) (quoting Federal Rule of Civil 
Procedure 12(b)). The district court allowed the former, in 
the form of affidavits. As to discovery, since we are convert-
ing the 12(b)(6) motion on appellate review, we do not have 
the benefit of the district court's determination of the necessi-
ty of discovery before summary judgment on the statutory 
count. It is possible that the district court, in denying the 
continuance, implicitly found no need for discovery before 
summary judgment on this count, but it is equally possible 
that it had already flagged the count as failing to state a 
claim, in which case the question of discovery would not arise.

 We believe the soundest course, in this case, is to decide 
the discovery question de novo. Pederson and Taylor, in 
their motion for a continuance, make much of the fact that 
retaliatory animus may be proved by circumstantial evidence. 
J.A. 137. Discovery, they claim, is necessary to allow them to 
ferret out such proof. But the weakness of Pederson and 
Taylor's case is not that it lacks evidence of animus--though 
it does--but that it lacks a showing of unlawful retaliation. 
Discovery will not help on this front, and Pederson and 
Taylor do not suggest that it will. There is no genuine issue 
of fact as to the existence of proscribed retaliation. Accord-
ingly, we would rule as did the district court on discovery, 
and, having converted the 12(b)(6) motion to a motion for 
summary judgment, affirm the district court's dismissal of 
Pederson and Taylor's statutory claim because a grant of 
summary judgment would have been correct.

 

 * * *

 The district court granted summary judgment for the 
FDIC on the First Amendment claims of Pederson and 
Taylor, reasoning that the voluntary nature of their departure 
precluded the equitable relief sought. Reviewing this deter-
mination de novo, we find that voluntary resignation bars not 
merely relief but also federal jurisdiction.

 To be sure, Pederson and Taylor term their resignations 
"constructive discharges." We rejected that characterization 
in our denial of a preliminary injunction, see Taylor v. 
Resolution Trust Corp., 56 F.3d 1497, 1505 (D.C. Cir. 1995) 


("Taylor I"), and although that decision lacks authoritative 
weight for this appeal, see University of Texas v. Camenisch, 
451 U.S. 390, 395 (1981), reconsideration has not changed our 
opinion. "[A] constructive discharge occurs where the em-
ployer creates or tolerates discriminatory working conditions 
that would drive a reasonable person to resign." Katradis v. 
Dav-El of Wash., 846 F.2d 1482, 1485 (D.C. Cir. 1988) 
(internal quotation marks omitted). It does not occur when 
an employee leaves an unpleasant but objectively tolerable 
job because alternatives have become more attractive, even if 
the employer's misbehavior creates the unpleasantness or, as 
we observed in the earlier appeal, its largesse affirmatively 
increases the appeal of the employee's alternatives. The 
standard may vary with the character of the job for which the 
employee was hired and thus, indirectly, with the employee's 
skills; conditions that are conventional for a stevedore may 
be intolerable for a lawyer, and perhaps vice versa. But the 
standard cannot ebb and flow with the tide of a particular 
employee's specific job alternatives. Here, Pederson and 
Taylor endured whatever the RTC inflicted until May 1995, 
when they took advantage of the severance package offered 
by the Voluntary Separation Incentive Program. They do 
not suggest that any simultaneous increase in the wattage of 
harassment drove them out. Thus no triable issue of fact 
exists on the question of constructive discharge.7

 A finding that no constructive discharge occurred will have 
different consequences according to the type of relief request-
ed. Pederson and Taylor seek reassignment to their 1991 
positions, injunctive relief against future harassment, and 
damages. We examine each in turn. The request for reas-
signment appears in the original complaint, J.A. 125, and was 

__________
 7 Pederson and Taylor sought leave to amend their complaint in 
order to offer new evidence bearing on constructive discharge. The 
district court denied their motion, and we uphold that decision 
under the abuse of discretion standard, given both the lateness of 
the filing of the proposed amended complaint and its failure, 
together with the additional affidavits (included in the Joint Appen-
dix) to firmly close the gaps in their case.


made when Pederson and Taylor were still employed by the 
RTC. They left the RTC during the pendency of this litiga-
tion, and what used to be reassignment now accordingly 
would require reinstatement. Since the original complaint 
simply asks for "an order restoring" them to their 1991 
positions, we could read it as in fact requesting reinstatement. 
This would be consistent with the desires expressed in a 
proposed amended complaint rejected by the district court. 
To save this element of the First Amendment count, however, 
would require more than turning reassignment into reinstate-
ment to account for the changed circumstances. The plain-
tiffs' voluntary departure creates a large hole in their cause of 
action: In requesting reinstatement, they seek a remedy for 
injury that is in large part self-inflicted. This is true whether 
we treat the defect as a matter of standing or the merits.

 Article III standing requires the plaintiff to show causa-
tion--that his injury is "fairly traceable to the defendant's 
allegedly unlawful conduct." Allen v. Wright, 468 U.S. 737, 
751 (1984). Our rejection of Pederson and Taylor's claim of 
constructive discharge is concomitantly a decision that their 
voluntary acts are sufficient independent causes of their 
separation from the RTC.

 This is quite consistent with their (theoretically) having a 
claim against the RTC for its earlier mistreatment. Suppose 
an employer wrongly denied an employee $25 in wages, upon 
which the employee left in a huff. Plainly he would have no 
claim to reinstatement, however valid his demand for $25 
damages. Had Pederson and Taylor remained, they might 
have been entitled to some sort of restoration to their earlier 
status; having left under circumstances for which the RTC is 
not legally culpable, however, they cannot claim that the RTC 
has deprived them of their jobs, even if its prior treatment of 
them, though falling short of constructive discharge, was 
actionable. Failing to show causation, they lack standing.


 Similarly, wrongful discharge (either actual or constructive) 
is a necessary element of a claim for reinstatement--discrimi-
nation and voluntary resignation are not enough. See, e.g., 
Maney v. Brinkley Mun. Waterworks & Sewer Dep't, 802 
F.2d 1073, 1075-76 (8th Cir. 1986); Derr v. Gulf Oil Corp., 
796 F.2d 340, 342-43 (10th Cir. 1986). Our rejection of the 
allegation of constructive discharge thus would also serve to 
resolve this claim against plaintiffs on the merits.

 The appropriate treatment of cases in which the standing 
inquiry overlaps with the merits so precisely is not entirely 
clear. We have disposed of cases on standing grounds after 
the merits-laden determination that a plaintiff's claim "ha[d] 
no foundation in law," Claybrook v. Slater, 111 F.3d 904, 907 
(D.C. Cir. 1997)--something we think could fairly be said of a 
reinstatement claim made in the face of voluntary resignation. 
See also Arjay Assocs. v. Bush, 891 F.2d 894, 898 (Fed. Cir. 
1989) (affirming dismissal for lack of standing after conclud-
ing plaintiff lacked enforceable right). But cf. Lewis v. 
Knutson, 699 F.2d 230, 237 (5th Cir. 1986) (suggesting that 
element essential to both standing and merits should be 
reviewed only for facial sufficiency of pleadings in standing 
analysis); ACLU v. FCC, 523 F.2d 1344, 1348 (9th Cir. 1975) 
(disposing of case on merits after determining that standing 
and merits inquiries overlapped). In this case, the conse-
quences of a disposition based on lack of standing do not 
differ greatly from those of one on the merits. On either 
approach, plaintiffs' request for reinstatement fails as a result 
of their voluntary resignation. The chief distinction is that 
after finding no standing, we may not affirm the district 
court's grant of summary judgment but must vacate and 
remand with instructions to dismiss. See Ramallo v. Reno, 
114 F.3d 1210, 1213-14 (D.C. Cir. 1997) (vacatur and remand 
with instructions to dismiss is appropriate disposition when 
appellate court loses jurisdiction). This disposition is em-
ployed regardless of whether the missing element of standing 
is required for the substantive cause of action. See Clajon 
Production Corp. v. Petera, 70 F.3d 1566, 1573 (10th Cir. 
1995) (dismissing for lack of jurisdiction despite identity of 
issues). Consequently, we will dispose of the reinstatement 
claim on standing grounds.


 The original complaint also sought a permanent injunction 
against future retaliation. As we held before, Pederson and 
Taylor's resignation moots this request by eliminating the 
possibility of future harm and the utility of the injunction. 
Taylor I, 56 F.3d at 1502-05. We have no jurisdiction over a 
moot claim. Finally, they ask for compensatory damages, a 
demand clearly not mooted by termination of employment. 
See Bois v. Marsh, 801 F.2d 462, 468-71 (D.C. Cir. 1986). To 
the extent that this request rests on the RTC Whistleblower 
Act, which explicitly offers a damages remedy as well as 
reinstatement, 12 U.S.C. s 1441a(q)(3), it falls with their 
statutory claim, as discussed above.

 Pederson and Taylor could also conceivably be seeking 
damages under the First Amendment. The defendant in this 
suit, however, is the FDIC, and no cause of action for 
damages for constitutional violations--whether called a Bi-
vens action or not--is to be implied against government 
agencies. FDIC v. Meyer, 510 U.S. 471, 484-86 (1994). 
Pederson and Taylor also name the RTC CEO (succeeded by 
the Chairman of the FDIC) as a defendant, but they name 
him in his official capacity and allege no unlawful acts on his 
part.8

 As we have no jurisdiction over Pederson and Taylor's 
constitutional claims to equitable relief, we vacate the district 
court's grant of summary judgment and remand with instruc-
tions to dismiss.

 * * *

__________
 8 Even supposing that appellants intended to proceed against the 
CEO individually, a suit for damages under the First Amendment 
would not get off the ground. We will not infer a Bivens remedy 
where Congress has created "comprehensive procedural and sub-
stantive provisions giving meaningful remedies against the United 
States...." Bush v. Lucas, 462 U.S. 367, 368 (1983). Here Con-
gress's enactment of the RTC Whistleblower Act precludes a Bi-
vens action under the First Amendment. See Bush, 462 U.S. at 367-
90 (refusing to imply Bivens remedy under the First Amendment 
given Civil Service Reform Act); Walleri v. Federal Home Loan 
Bank of Seattle, 83 F.3d 1575, 1583-84 (9th Cir. 1996) (same with 
respect to FDIC Whistleblower Act).


 The third appellant is Burgos, who also brings statutory 
and constitutional claims. We find his statutory complaint 
facially inadequate and affirm the district court's dismissal; 
we also affirm the grant of summary judgment on his consti-
tutional claim.

 The retaliation that Burgos points to is, primarily, the 
demotion that led to his resignation. Although the complaint 
may be read to suggest that his assignment to "problem 
cases" also constituted retaliation for disclosures about over-
billing by outside law firms, counsel appeared to abandon this 
aspect at oral argument, describing it as merely stage-setting; 
nor does Burgos mention it in his briefs. Appellants' Br. at 
27, 32-34; Appellants' Reply Br. at 17-20.

 The demotion came in response to Burgos's filing his 
"Informative Motion" with the district court in the Crabb 
litigation. As far as the RTC Whistleblower Act is con-
cerned, Burgos encounters the immediate difficulty that the 
Act protects disclosures only to the entities specified: the 
RTC, the Thrift Depositor Protection Oversight Board, the 
Attorney General, or an appropriate banking agency. 12 
U.S.C. 1441a(q). It does not protect communications to 
courts. Although the "Informative Motion" states that a copy 
is being sent to the RTC Inspector General, Burgos himself 
does not claim that that copy played any role in his demotion; 
his superiors were amply infuriated by his filing in court.

 

 * * *

 Burgos argues also that his demotion violated his First 
Amendment rights, invoking the principle giving government 
employees some protection from discipline for their speech. 
See Connick v. Myers, 461 U.S. 138 (1983); Pickering v. 
Board of Education, 391 U.S. 563 (1968). Nothing in this 
doctrine automatically withholds protection for disclosures to 
courts. Nonetheless, the district court granted summary 
judgment to the defendant, and we affirm.

 Pickering directs courts to strike "a balance between the 
interests of the [employee], as a citizen, in commenting upon 
matters of public concern and the interest of the State, as an 


employer, in promoting the efficiency of the public services it 
performs through its employees." Id. at 568. Connick 
makes clear that the doctrine covers only speech on a matter 
of public concern, i.e., of "political, social, or other concern to 
the community." Connick, 461 U.S. at 146; see F.D.R. Fox 
v. District of Columbia, 83 F.3d 1491, 1493 (D.C. Cir. 1996).

 The public concern inquiry is one of law, Connick, 461 U.S. 
at 150 n.10; Fox, 83 F.3d at 1493, to be determined by 
looking at "the content, form, and context of a given state-
ment, as revealed by the whole record." Connick, 138 U.S. at 
147-48. The district court concluded that Burgos's "Informa-
tive Motion" did not involve a matter of public concern. 
Reviewing de novo, we agree.

 Burgos in his briefs claims that he disclosed to the court 
that his supervisors were continuing to litigate a moot case, 
Appellants' Br. at 34, in order to cover up their earlier 
default, Appellants' Br. at 19-20. This sort of governmental 
misbehavior certainly sounds like an object of public concern, 
although as a preliminary matter, it is not altogether clear 
how the alleged cover-up was supposed to function. Litigat-
ing a settled case does not seem an effective strategy for 
concealing a default; presumably, the shirkers would want to 
slink away from court, not call attention to their neglect by 
bringing motions to vacate. But we need not try to unravel 
this tangle, for a glance at the actual "Informative Motion" 
cuts clean through.

 What that motion discloses is the following: The opposing 
party had asked for sanctions against Burgos. He recom-
mended to his superiors that litigation be discontinued and 
unilaterally instructed outside counsel to withdraw the pend-
ing motion to vacate the judgment. He refused an order to 
change his instructions to the outside counsel, calling it 
"unethical," and his superiors overrode his wishes. J.A. 
1080-83. There is no mention of mootness, and none of an 
attempt to camouflage default, but prominent reference to the 
fact that sanctions were being sought.

 The content, form, and context of the motion lead to the 
conclusion that, as Burgos's First Affidavit admits, it was 


intended to "identify[ ] who was responsible for the direction 
of this litigation and that [Burgos] had ordered the Motion to 
Vacate to be withdrawn." J.A. 997. Neither of these ele-
ments, without more, is a matter of public concern; released 
to the public, this motion would reveal no more than "the fact 
that a single employee is upset with the status quo." Con-
nick, 461 U.S. at 148. The purpose of the communication was 
to avoid personal sanctions, not to expose wrongdoing. 
Whatever the outcome with respect to the former (Burgos 
does not tell us), there was no real gesture towards the latter, 
and the incidental and unexplained reference to "unethical 
conduct" does not change this fact. Of course a speaker 
might combine an effort to deflect blame with a Connick-
qualifying revelation of government dereliction. But to say, 
"He did it," or "He made me do it," where "it" is already 
established, is just garden-variety finger-pointing. And rhe-
torical embellishments marginally increasing the associated 
obloquy do not elevate it to a matter of public concern. 
Accordingly, disciplinary actions taken in response to Bur-
gos's affidavit could not offend the First Amendment.

 

 * * *

 With respect to Pederson and Taylor, we convert the 
government's 12(b)(6) motion on the statutory counts to a 
motion for summary judgment and affirm. On the constitu-
tional count, finding no jurisdiction over the equitable claims 
we vacate the grant of summary judgment and remand with 
instructions to dismiss. We find no constitutional cause of 
action for damages, and affirm the grant of summary judg-
ment. With respect to Burgos, we affirm both the dismissal 
of the statutory count and the grant of summary judgment on 
the constitutional count.

So ordered.



 Rogers, Circuit Judge, concurring: I join the opinion of the 
court save for its treatment of appellants' request for equita-
ble relief as a matter of constitutional standing. See opinion 
at 17-19. Rather, because there was insufficient evidence to 
show that appellants were constructively discharged, given 
their voluntary departures, see opinion at 16-17, their request 
for equitable relief fails for lack of an evidentiary foundation. 
This finding seems to me to be the fundamental one. On 
their pleadings, appellants' injury is traceable to appellees' 
actions; that the court cannot credit the pleadings is not a 
standing analysis, but a determination of evidentiary suffi-
ciency. See Claybrook v. Slater, 111 F.3d 904, 907 (D.C. Cir. 
1997); Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 664 
n.1 (D.C. Cir. 1996) (en banc) (citing Flast v. Cohen, 392 U.S. 
83, 101 (1968)).